## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

RITU BHAMBHANI, LLC d/b/a COMPLETE  :
CARE OF MARYLAND                       :
c/o Ritu Bhambhani, M.D.          :
496 Rutland Drive                     :    Civil Action No.: _____
Fallston, MD 21047                :
                                 :
BOX HILL SURGERY CENTER, LLC    :
c/o Ritu Bhambhani, M.D.          :           **COMPLAINT**
100 Walter Ward Boulevard, Suite 100  :
Abingdon, MD 21009              :
                                 :       *Jury Trial Demanded*
PAIN AND SPINE SPECIALISTS OF    :
MARYLAND, LLC                 :
c/o Sudhir Rao, M.D.             :
2702 Back Acre Circle, Suite 290B    :
Mt. Airy, MD 21771              :
                                 :
SIMCARE ASC, LLC
c/o Sudhir Rao, M.D.
100 Walter Ward Boulevard, Suite 100
Abingdon, MD 21009
                      *Plaintiffs*,

- v. -

NEURAXIS, INC. f/k/a INNOVATIVE
HEALTH SOLUTIONS, INC.
829 S. Adams St.
Versailles, IN 47042

<u>SERVE ON</u>:
      Resident Agent
      829 S. Adams St.
      Versailles, IN 47042

ACCLIVITY MEDICAL, LLC
456 Glengarry Way
Fort Wright, KY 41011

<u>SERVE ON</u>:
      Resident Agent
      456 Glengarry Way
      Fort Wright, KY 41011

JOY LONG
2329 East 500 North
Greenfield, IN 46140

*Defendants*.

Plaintiffs Ritu Bhambhani, LLC d/b/a Complete Care of Maryland and Box Hill Surgery Center LLC (collectively, the "Bhambhani Practice Entities"), and Pain and Spine Specialists of Maryland, LLC and SimCare ASC LLC (collectively, the "Rao Practice Entities"), for their Complaint against Defendants Neuraxis, Inc. f/k/a Innovative Health Solutions, Inc. ("IHS"), Acclivity Medical LLC ("Acclivity"), and Joy Long ("Long") (collectively, "Defendants") hereby allege as follows:

### SUMMARY OF PLAINTIFFS' ALLEGATIONS

1. The Bhambhani Practice Entities and the Rao Practice Entities are medical professional practice entities (collectively "Medical Providers") that purchased a medical device known as the Neuro-Stim System ("NSS"). The Medical Providers' purchase of the NSS was based on false and/or fraudulent representations concerning how to bill and collect health insurance reimbursements (including Medicare) for the cost of the device and the services associated with the NSS's implantation.

2. Briefly, the NSS is a device purportedly designed to provide field stimulation to peripheral and cranial nerves in the auricle—that is, the outer ear—over a five-day period. It is purportedly recommended for pre-operative, intra-operative, and post-operative pain therapy as well as for the treatment of chronic pain. It is placed behind the patient's ear and purportedly connected to stimulation electrode "arrays" placed "percutaneously" in the auricle. However, the NSS was cleared by the Food and Drug Administration ("FDA") in 2014 merely for use in acupuncture, not medical applications. In the 501(k)-premarket clearance application submitted to

the FDA, IHS explicitly described the device as an electro acupuncture device for use exclusively in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states; not as an implantable medical device. *See* FDA 510(k) Clearance Letter K140530 at <u>Exhibit 1</u>.

3.      Despite being approved only for acupuncture, IHS fraudulently sold and marketed the device as a surgically implantable medical device, not just a tool for acupuncture. IHS engaged in this fraudulent scheme through a series of exclusive-rights sales-agent distributors ("Sales Agents"), including but not limited to Acclivity. Acclivity is owned and controlled by its sole member Ryan Kuhlman, who IHS now employs directly as its "National Director." IHS and its Sales Agents invested substantial sums in advertising and marketing the NSS throughout the United States, including on websites, at trade shows, in brochures, in newsletters, in videos, on phone calls, in emails, and in on-site presentations at physician offices and ambulatory surgery centers.

4.      For example, in a slide show presented to the Bhambhani Practice Entities by Acclivity's agent and "sub-distributor," Innovative Healthcare Solutions LLC ("IHCS"), IHCS explicitly referred to the NSS as being "FDA-approved," and claimed that "NSS is the first and only FDA approved electro-auricular, peripheral nerve stimulator currently on the market to treat acute and chronic pain." *See* IHCS Physician Power Point Slide Show at <u>Exhibit 2</u>. Those statements were made directly to the Bhambhani entities. Notably, while the IHCS Physician Power Point Slide Show cited to FDA 510(k) Clearance Letter K140530, no reference to acupuncture or electro-acupuncture is made anywhere within the IHCS Physician Power Point Slide Show.

5.      Similarly, in a "FAQ Sheet for Clinicians" prepared by IHS (as evidenced by the branding on the document) and provided to the Rao Practice Entities by Acclivity, the NSS is

referred to as "FDA cleared for targeting acute and chronic pain." *See* FAQ Sheet for Clinicians at <u>Exhibit 3</u>. Incredibly, nowhere in the 20-page FAQ Sheet for Clinicians does the word acupuncture appear.

6.     Defendants promoted the NSS as a surgically-implantable nerve stimulator billable to third-party payers, including Medicare, under a corresponding set of standardized national medical billing codes. In that regard, Current Procedural Terminology ("CPT") codes are the national standard for how medical professionals document and report medical, surgical, radiology, laboratory, anesthesiology, and evaluation and management services. All healthcare providers, payers, and facilities (including Plaintiffs) are required to use CPT codes. These codes are used by insurers to help determine the amount of reimbursement that a practitioner will receive for services provided. CPT codes are developed, maintained, and copyrighted by the American Medical Association, and are mandatory under the transaction standards promulgated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") for reporting the performance of medical procedures when submitting electronic billing. In short, CPT is the uniform language of medical providers, including Plaintiffs.

7.     As a means of enticing the Medical Providers to purchase and use the NSS, Defendants falsely promoted the billing of the NSS using a specific set of codes used to report implantable nerve stimulators, including CPT 64555, Percutaneous Implantation of Neurostimulator Electrodes at a Peripheral Nerve (the "NSS Coding Scheme"). This code, and the ancillary codes billed with it covering both professional and facility charges, provided for between $4,800.00 and $11,400.00 *per patient* in reimbursement from payers for a procedure with little associated cost, that takes ten minutes to perform. Through the NSS Coding Scheme, Defendants sold tens of thousands of NSSs throughout the United States and touted itself as the market leader

of the industry.

8.      The NSS Coding Scheme also involved IHS and its Sales Agents employing so-called independent coding consultants ("Coding Agents"), including but not limited to DragonSlayer Strategies LLC ("Dragon Slayer"), which, prior to its dissolution in 2015, was owned and controlled by Defendant Long, and Coleman Certified Medical Billing & Consultant, LLC ("Coleman"). Coleman is owned and controlled by Kimberly Coleman.

9.      For example, in a September 2015 email to one of the Rao Practice Entities' employees, Dragon Slayer, through Long and on behalf of Acclivity, provided more than twenty pages of attachments, including a coding memorandum and "template" procedure notes and letters of medical necessity characterizing the NSS as a neurostimulator, reportable under CPT 64555, and "clearly delineated from acupuncture" or electro-acupuncture. *See* September 22, 2015 Email with attachments from Joy Long at Exhibit 4. Similarly, in an August 2016 email to the Rao Practice Entities, Coleman, through Kimberly Coleman and on behalf of Acclivity, purported to provide additional research supporting billing CPT 64555 for the NSS, stating that the "NSS is a percutaneous implantation neurostimulator electrode array that are applied and leads are placed for specific nerves." *See* August 5, 2016 Email with attachments from Kimberly Coleman at Exhibit 5. These representations are knowingly false and were knowingly false when made.

10.      Defendants deliberately concocted the NSS Coding Scheme intending, or having reason to expect, that the substance of these billing, coding, and reimbursement misrepresentations would be communicated and repeated to the Bhambhani Practice Entities, the Rao Practice Entities, and other medical providers by and through IHS's Sales Agents (including, but not limited to IHCS and Acclivity) and IHS's Coding Agents (including, but not limited to, Dragon Slayer and Coleman). Defendants also intended their misrepresentations to induce the Bhambhani

Practice Entities, the Rao Practice Entities, to rely upon said misrepresentations and upon which the Bhambhani Practice Entities, the Rao Practice Entities and other medical providers did, indeed, justifiably rely to their detriment when deciding to purchase the NSS from IHS and/or its Sales Agents.

11.     The Bhambhani Practice Entities and the Rao Practice Entities bring this action on to redress the direct and substantial harm they suffered as a result of their reliance upon Defendants' deliberate misrepresentations concerning the correct billing, coding, and reimbursement for the NSS.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states. *See* 28 U.S.C. § 1332(a)(1).

13.     This Court has subject matter jurisdiction over Plaintiffs statutory claims brought under 18 U.S.C. §§ 1962 (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act pursuant to 28 U.S.C. § 1331 (federal subject matter jurisdiction) and 18 U.S.C. §§ 1965(b) and (d) (RICO).

14.     This Court also has personal jurisdiction over Defendants because they are authorized to do business and in fact do business in this state and District, and/or Defendants have sufficient minimum contacts with this state and District, and/or Defendants otherwise intentionally avail themselves of the markets in this state and District through the promotion, marketing, and sale of the NSS in this state, which renders the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9571266.1 34295/144221  7/14/22

15.     Venue is proper in this District under 28 U.S.C. § 1391. Defendants do substantial business in this state and within this District, advertise in this this state and within this District, receive substantial compensation and profits from the sale of the NSS in this state and within this District, and engaged in deliberately misleading representations concerning the correct billing, coding, and reimbursement for the NSS in this state and within this District to subject Defendants to *in personam* jurisdiction in this District. Furthermore, the transactions between Defendants and the named Plaintiffs occurred in this state and within this District.

16.     Plaintiffs were both members of the proposed class in a putative class action previously filed in this Court under the caption *Bhambhani, M.D., et al. v. Innovative Health Solutions, Inc. et al.,* No. 1:19-cv-00355-LKG. That case was dismissed by the Court on June 14, 2022, based what the Court determined was a lack of standing of Dr. Bhambhani and Dr. Rao to pursue individual claims against the defendants in that action. As such, the statute of limitations for the Plaintiffs to assert their own claims here was equitably tolled as of the filing date of the since-failed putative class action on February 6, 2019.

## THE PARTIES

17.     Plaintiff Ritu Bhambhani, LLC d/b/a Complete Care of Maryland is a Maryland limited liability company with registered address at 496 Rutland Drive, Fallston, MD 21047.

18.     Plaintiff Box Hill Surgery Center LLC, a Maryland limited liability company with registered address at 100 Walter Ward Boulevard, Suite 100, Abingdon, MD 21009, which owns and operates a state-of-the-art ambulatory surgery center.

19.     Ritu Bhambhani, M.D. ("Dr. Bhambhani") is the sole member of Plaintiff Ritu Bhambhani LLC and Plaintiff Box Hill Surgery Center LLC.  She is a medical doctor practicing in Abingdon, MD. She is board-certified in both Anesthesiology and Pain Medicine and is

affiliated with multiple hospitals in the area, including MedStar Franklin Square Medical Center and University of Maryland Harford Memorial Hospital. She received her medical degree from Maulana Azad Medical College, completed both a residency and fellowship at the prestigious Cleveland Clinic Foundation in Ohio, and has been in private practice for more than 20 years.  Dr. Bhambhani conducts her private medical practice through Ritu Bhambhani LLC d/b/a Complete Care of Maryland and she performs many of her more invasive pain management procedure through Box Hill Surgery Center LLC.

20.     Plaintiff Pain and Spine Specialists of Maryland LLC is a Maryland limited liability company with registered address at 2702 Back Acre Circle, Suite 290B, Mt. Airy, MD 21771.

21.     Plaintiff SimCare ASC LLC is a Maryland limited liability company with registered address at 100 Walter Ward Boulevard, Suite 100, Abingdon, MD 21009, which owns and operates a state-of-the-art ambulatory surgery center.

22.     Sudhir Rao, M.D. ("Dr. Rao") is a medical doctor practicing primarily in Mount Airy, MD, but also practicing in Elkridge, Ellicott City, Fredrick, Rockville, Germantown, and Hagerstown, MD, as well as Harrisonburg, VA and several offices in the Commonwealth of Pennsylvania. He is board-certified in Anesthesiology and Pain Medicine by the American Board of Anesthesiology and is affiliated with multiple hospitals in the tri-state area, including Frederick Memorial Hospital and Highlands Hospital. He received his medical degree from St. George's University School of Medicine; completed an internship at the Greater Baltimore Medical Center; completed a residency at Albert Einstein College of Medicine/Montefiore Medical Center; and completed a fellowship at St. Sinai College of Medicine. He has since been in private practice for more than 12 years, practicing interventional pain medicine. Dr. Rao conducts his private practice through Pain and Spine Specialists of Maryland LLC, and he performs many of his more invasive

pain management procedures through Simcare ASC LLC. Dr. Rao is the sole member of both entities.

23.     IHS is an Indiana corporation which at all relevant times herein, was and is engaged in the business of marketing, selling, and distributing the NSS, as more fully described herein, throughout Maryland and the United States, with a registered office at 829 S. Adams St., Versailles, IN 47042.

24.     Acclivity was a Kentucky limited liability company which at all relevant times herein, was and is engaged in the business of marketing, selling, and distributing the NSS, as more fully described herein, throughout Maryland and the United States, with a registered office at 456 Glengarry Way, Fort Wright, KY 41011.

25.     Long was the sole member of Dragon Slayer until it was dissolved by the Secretary of State of Indiana on May 14, 2014. Under Indiana law, therefore, Long is personally responsible for liabilities of Dragon Slayer relative to its participation in the NSS Coding Scheme, and the misrepresentations it made to the Rao Practice Entities and others as a Coding Agent of IHS promoting the NSS. Long resides at 2329 East 500 North, Greenfield, IN 46140.

## FACTS COMMON TO ALL COUNTS

**A.      IHS's Development and Sale of the NSS.**

26.     Before developing the NSS, IHS was the exclusive U.S. distributor of the device that was listed as the NSS's primary predicate on FDA 510(k) Clearance Letter K140530, the "P-STIM." The P-STIM was developed by Biegler GbmH, an Austrian Company. IHS invested substantial sums into advertising and marketing its P-STIMs throughout the United States, through Sales Agents and Coding Agents, including on its website, at trade shows, in brochures, in newsletters, in videos, on phone calls, in emails, and during on-site presentations at physician

offices and ambulatory surgery centers. In just a few short years, IHS sold tens of thousands of P-STIMs to medical providers who treat patients suffering from acute or chronic pain.

27.     The success of its sales and marketing efforts relative to the P-STIM—based on the identical billing, coding, and reimbursement representations it adopted as part of the NSS Coding Scheme—led IHS to develop its own device, one that was "substantially similar" to the P-STIM both in functionality and outcomes. To do so, IHS engaged Key Electronics, Inc. ("Key Electronics"), an electronics manufacturing service provider of custom-built products, located in Jeffersonville, Indiana. Key Electronics is listed as the manufacturer of the NSS on FDA 510(k) Clearance Letter K140530, but, upon information and belief, the development of the NSS was done on a "work for hire" basis, with ownership of all intellectual property associated with the NSS, including the trade-name and one or more utility patents, belonging to IHS.

28.     Once the FDA cleared the NSS to be marketed, IHS engaged multiple Sales Agents, including but not limited to IHCS and Acclivity, to market the NSS to medical providers treating patients suffering from acute or chronic pain. IHS largely employed the same sales and marketing tactics it used with the P-STIM—focusing on representations made through mail and electronic communications related to the billing, coding, and reimbursement of the devices. IHS provided information and documents related to the billing, coding, and reimbursement it employed relative to the P-STIMs to the Sales Agents and Coding Agents it engaged to sell and market the NSS on behalf of IHS, including, but not limited to, IHCS and Acclivity. The Bhambhani Practice Entities and the Rao Practice Entities were two sets of medical providers that IHCS and Acclivity, as Sales Agents of IHS, promoted the NSS to using the information and documents IHS provided them as part of the NSS Coding Scheme.

29.     A primary driver of IHS's development of the NSS and subsequent fraudulent advertising and marketing effort was to escape the "negative stigma" of the P-STIM and to increase its use by medical providers. To accomplish this, IHS, both directly and through its Sales Agents, falsely promised that purchasing and dispensing the NSS to patients would be highly profitable to medical providers, including the Plaintiff Medical Providers in this case. IHS and its Sales Agents and Coding Agents worked together as an association-in-fact to build and market a false narrative. In 2011 the P-STIM had already been deemed not applicable to the coding sequence that IHS and its Sales Agents and Coding Agents promoted in written communications, presentations, and other materials to Plaintiffs and the Proposed Class. Further, in April 2011, the Centers for Medicare and Medicaid Services ("CMS") created the Healthcare Common Procedure Coding System ("HCPCS") code "S8930": Electrical stimulation of auricular acupuncture points, each 15 minutes of personal one-on-one contact with the patient, specifically for devices such as the P-STIM and NSS. And electro acupuncture services reported to CMS under that code were excluded from coverage by most Medicare Administrative Contractors ("MAC").

30.     Knowing all of this, IHS President Brian Carrico explicitly instructed IHS Sales Agents, including specifically IHCS and Acclivity, as follows: "It's a peripheral neurostimulator. That's how we sell this. Don't ever use the word acupuncture or meridian point or anything like that." The development of the NSS was specifically intended to circumvent the payer scrutiny focused on the P-STIM, and the NSS Coding Scheme was specifically intended to mirror the billing scheme IHS and other distributors of the P-STIM perpetrated previously.

31.     To try and further insulate itself from the NSS Coding Scheme, IHS used "independent" Sales Agents to distribute the NSS, with the country divided into exclusive sales territories. As Mr. Carrico explained it to IHS Sales Agents, even the IHS website was merely a

lead generator. If a medical provider attempted to purchase the NSS through the IHS website directly, that prospective purchaser's information would be provided to the Sales Agent with exclusivity over that territory, or as Mr. Carrico conceded, "if somebody orders on there, quote/unquote, 'orders,' that's simply a lead. If the lead comes from Alabama then it goes to [Daniel]. If it goes to Kalamazoo, it goes to Christa, and so on and so forth."

32.     Not only did IHS only sell the NSS through Sales Agents, but it provided ***and paid*** the Coding Agents to assist the Sales Agents by "confirming" the billing, coding, and reimbursement instructions that are at the heart of the NSS Coding Scheme. IHS directly compensated those Coding Agents $180 per "new account" to provide pre-populated "pre-cert instructions," "coding," "diagnosis codes," "post-op follow-up documentation," and "dictation," or as Mr. Carrico told his Sales Agents, "everything like that that you need. They get that directly to your account, something you'll never have to worry about."

33.     The coding information being conveyed to potential NSS purchasers by Sales Agents and Coding Agents very clearly originated from IHS. For example, materials provided to the Rao Practice Entities by Long via email in September 2015 used identical language to a subsequent email to the Rao Practice Entities from Acclivity in July 2016 purporting to quote "an excerpt from a former AMA advisor as the [] use of CPT code for NSS." *Compare* Exhibit 4 *with* July 14, 2016 email with attachments from Matthew Miller ("Miller") at Exhibit 6. Incredibly, both Long and Acclivity opined that the NSS "is clearly delineated from acupuncture and other neuro-stimulator treatments." And the materials provided to medical providers by IHCS, Acclivity, and other IHS Sales Agents (such as Tomahawk Medical and Dixon Medical Distributors) were all substantively identical in both form and substance.

9571266.1  34295/144221  7/14/22

34.     IHS's fraudulent characterization of the NSS as an implantable nerve stimulator, and the promise of "extraordinary reimbursement" to the Medical Providers was the spark that gave life to Defendants' entire scheme. As Mr. Carrico admitted to his Sales Agents in his capacity as principal of IHS, that "You cannot go wrong by going to a physician because the reimbursement is so strong."

35.     In truth, however, the NSS was no different than the "negative stigma" of the P-STIM. Indeed, in August 2016, Novitas published Local Coverage Advisory A55240, which specifically: (i) identified the NSS as electro acupuncture device; and (ii) noted that the NSS was not covered by the Medicare program. The NSS Coding Scheme was built on a house of cards.

**B.     The Bhambhani Practice Entities' Experience with the NSS Coding Scheme.**

36.     The Bhambhani Practice Entities were originally contacted by IHCS on August 17, 2015. Dr. Bhambhani, on behalf of her entities, received an email from Robert A. "Bobby" Smith ("Smith"), Vice President of Sales and Marketing for IHCS, which introduced the NSS, and enclosed the IHCS Physician Power Point Slide Show. Smith's email stated:

> Dr Bhambhani, My company has the exclusive rights to a recently FDA and VA approved device for acute and chronic pain. I live in Maryland and am selecting key practices now. We have launched with prominent Physicians and larger surgery groups throughout the U.S. I have attached the Slideshow above along with a short Science Video https://vimeo.com/user17291718/review/108118730/56e5ec2571. They feature the technology along with the ***extraordinary reimbursement*** for this treatment. Select practices can participate in our Full Service Program outlined on the attached PowerPoint.

*See* August 17, 2015, Email from Smith, Exhibit 7.

37.     So, from the start, the false promise of extraordinary reimbursement and the IHCS Physician Power Point Slide Show were the foundation of how IHS marketed, promoted, and sold the NSS to the Bhambhani Practice Entities. Among the representations made in the IHCS Physician Power Point Slide Show were the following:

13

a.       NSS is a patented, FDA approved peripheral nerve stimulator designed to provide field stimulation to peripheral and cranial nerves in the auricle over a 5-day period.

b.       It is FDA approved for chronic and acute pain.

c.       NSS is the first and only FDA approved electro-auricular, peripheral nerve simulator currently on the market to treat acute and chronic pain.

d.       NSS is reimbursed by Medicare when performed at an ASC.

e.       The following Insurers pay for in office and ASC: Major health insurers; workers compensation insurers; and personal injury insurers.

*See* <u>Exhibit 2</u>, 3, 12, 14.

38.       The IHCS Physician Power Point Slide Show promised guaranteed profits through a "turn-key program" with "no upfront cost":



*See* <u>Exhibit 2</u>, 15.

39.       As to the guarantee of profits, IHCS offered two distinctly different programs: the "Full Service Program" and the "Direct Purchase Program." The difference between the two programs was relatively straightforward. With the Full-Service Program, IHCS (or its affiliates, including Acclivity) would provide "full-service" billing and collections services:



*See* <u>Exhibit 2</u>, 18.

40.     With the Direct Purchase Program, IHCS provided billing/collections protocols they received from IHS as part of the Direct Purchase:



*See* <u>Exhibit 2</u>, 21.

41.     These billing protocols, which were identical to the billing protocols IHS created to promote the P-STIM included specific coding advice whereby the NSS was to be billed under "CPT 64555, Percutaneous Implantation of Neurostimulator Electrodes at a Peripheral Nerve":



*See* <u>Exhibit 2</u>, 22.

42.     Regardless of which program, however, the touchstone of the sales pitch was extraordinary reimbursement and high profit—just as it was when IHS promoted the P-STIM:



*See* <u>Exhibit 2</u>, 26.

43.     Incredibly, however, nowhere in the IHCS Physician Power Point Slide Show, or any other information or document provided to the Bhambhani Practice Entities, was it disclosed that the NSS was in fact cleared by the FDA as an electro acupuncture device for use in the practice

16

of acupuncture by qualified practitioners of acupuncture.

44.     On September 8, 2015, Kristen Brannon ("Brannon"), Vice President of Operations for IHCS, sent an email to the Bhambhani Practice Entities attaching certain NSS "billing information," including a Precertification and Billing Overview; an NSS Precertification Form; and an NSS Procedure Note Template, all of which were provided to IHCS by the NSS Enterprise. *See* September 8, 2015, Email from Brannon, Exhibit 8. Notably, the NSS Procedure Note Template referred to the NSS service by the CPT descriptor only, and again contained no reference to electro acupuncture.

45.     On September 9, 2015, Smith sent the Bhambhani Practice Entities two more email solicitations. *See* September 9, 2015, Emails from Smith, Exhibit 9. The first contained certain clinical studies purporting to extol the efficacy of the NSS, on which Mr. Carrico, as "one of the owners and pioneers of this technology," was copied. The second included links to training videos and an extensive list of applications for the device.

46.     In reliance upon IHCS statements concerning the efficacy of the NSS, as well as the corresponding reimbursement figures devised by IHS, the Bhambhani Practice Entities enrolled in the IHCS Full Service Program, at a cost of $900 per NSS; and made orders that were fulfilled through Acclivity on September 14, 2015 and October 6, 2015. *See* Exhibit 10, 1, 2.

47.     On September 28 and 29, 2015, Brannon sent emails providing additional coding advice to the Bhambhani Practice Entities vis-a-vis the NSS. *See* September 28 and 29, 2015, Emails from Brannon, Exhibit 11. Specifically, Brannon stated that a modifier is no longer necessary to bill CPT code 64555 for the NSS service. She further guided the Bhambhani Practice Entities on what to do when a Medicare claim is rejected and how to successfully "rebill" such a claim.

48.     Again, on December 8, 2015, Brannon provided coding advice by stating the codes to use for workers compensation claims and confirmed the propriety of the same code sequence set forth on the IHCS Physician Power Point Slide Show. *See* December 8, 2015, Email from Brannon, Exhibit 12.

49.     In all, between September 2015 and June 2016, the Bhambhani Practice Entities purchased 420 NSSs, for $264,000, all paid to Acclivity. *See* Exhibit 10.

50.     In or about August 2016, however, the Bhambhani Practice Entities' reporting of the code sequences explicitly provided by the Defendants prompted Novitas, the MAC responsible for administration of the Medicare program in Maryland, to initiate both post-payment and prepayment audits of both the Bhambhani Practice Entities.

51.     Upon learning that the audits were initiated due to the suspicion that the Bhambhani Practice Entities and her entities were improperly submitting bills for electro acupuncture to the Medicare program, Dr. Bhambhani attempted to return her remaining inventory of NSSs to IHS.

52.     On or about September 1, 2016, Mr. Carrico responded to Dr. Bhambhani's return request with a bold-faced lie, telling her that "IHS has not and does not get involved in billing and coding in any way." *See* September 1, 2016, Email from Carrico, Exhibit 13. He went on to suggest, rather, that IHS could not accept the device returns, but would be happy to assist her in billing them to commercial insurance companies, and recommended a third-party billing services that would "do a tremendous job of pre-authorizing and billing for the NSS which will allow you to have 0 headaches, help patients, be very profitable, and be protected." *See id.*

53.     In November and December of 2016, the Bhambhani Practice Entities were hit with a series of refund demands from Novitas on behalf of the Medicare program, with the total amount of refunds exceeding $1,000,000.00. While those refunds were appealed and remain pending

before the Office of Administrative Law, a substantial portion of the disputed refund amount has already been offset from other claims payable to the Bhambhani Practice Entities, and the Bhambhani Practice Entities have already spent tens of thousands of dollars in legal fees and other related expenses relative to defending the Medicare audits—all on account of the deliberate misrepresentation of IHS and its Sales Agents relative to the NSS.

**C.    The Rao Practice Entities' Experience with the NSS Coding Scheme.**

54.    The Rao Practice Entities were initially solicited to purchase the NSS by Acclivity on or about September 15, 2015, through an email from Miller, whose email signature identified him as a Distributor/Principal of Acclivity. Attached to this email was a document entitled "ASC BILLING POST OP PAIN MANAGEMENT." *See* <u>Exhibit 14</u>. That document provided coding and reimbursement advice consistent with the slide show provided to the Bhambhani Practice Entities by IHCS, and the NSS Coding Scheme overall: "The ASC will receive the bulk of the reimbursement (device reimbursement is rolled into the procedure reimbursement). However, physician can also bill for 64555 with a modifier "PC" which pays just under $200 in most cases." *See id.*

55.    Dr. Rao asked Miller to provide information on the NSS to one of his staff members, Ginny Goldbach ("Goldbach"). In response, Miller forwarded Goldbach an email with several attachments, including the FAQ Sheet for Clinicians prepared by IHS (*See* <u>Exhibit 3</u>), a document titled "NSS – Science and Overview" (*See* <u>Exhibit 15</u>), and a document titled "EAD Brochure" (*See* <u>Exhibit 16</u>). Notably two of these three documents were prepared by IHS and branded accordingly. And more importantly, not one of these documents stated that the NSS was FDA-cleared as an electroacupuncture device. Thus, consistent with Mr. Carrico's explicit instructions to all IHS Sales Agents, the word "acupuncture" did not appear even once.

56.     An hour later, Miller forwarded Goldbach an email from Kuhlman attaching several "exemplar" Explanation of Benefits ("EOB") statements. *See* <u>Exhibit 17</u>. These EOBs showed payments to other medical providers from a variety of insurance companies and other third-party payers, including Medicare, for bills submitted under the codes promoted by Defendants as part of the NSS Coding Scheme, including CPT 64555. Miller explicitly identified these in email correspondence to Goldbach as being EOBs "for NSS use," and pointed to reporting not only CPT 64555 but also code modifiers and placement sites to be used with the code. *See id.*

57.     Later that day, Miller put Goldbach in contact with Long to discuss coding and billing for the NSS. The two spoke by phone first, and Long followed up with an email to Goldbach with several attachments, including a coding memorandum and "template" procedure notes and letters of medical necessity characterizing the NSS as a neurostimulator, reportable under CPT 64555, and "clearly delineated from acupuncture" or electro-acupuncture. *See* <u>Exhibit 4</u>. In those documents sent to Goldbach by email, Long represented:

    a.    In the example pre-qualification letter that "[t]he neurostimulator technique that we are using with this patient *is clearly delineated from acupuncture* and other neurostimulator treatments" and that "[t]he unique nerve mapping techniques and direct stimulation of the neurovascular complexes acts at the mid-brain, trigeminal complex, and spinal cord affecting descending and ascending inhibition of neuro-matrix alteration and thus clearly *separates the use of NSS from acupuncture, electro-acupuncture*, certain other surgically implantable nerve stimulators(such as spinal cord stimulators) and TENS. And so, it is important to re-iterate that with the implementation of the above mentioned techniques, the use of *the NSS modality is NOT considered acupuncture or electro-acupuncture* as meridian points, acu-points, reflexology points and/or dermatomes are NOT targeted."

    b.    That the NSS was a "non-programmable neurostimulator used for both therapeutic and diagnostic purposes" which is "transcutaneously placed on the mastoid process and the twelve (three lead – 4 pin) electrodes are percutaneous implanted in the appropriate nerve bundle within the cranial or peripheral nerve bundles that traverse through the auricular area."

    c.    That "MDs, Dos, Pas, NPs, and CRNAs are typically reimbursed for performance of the procedure. DCs should check their state Scope of

Practice as many states do not allow chiropractors to puncture the skin. Historically, podiatrists struggle to receive in-office reimbursement for electrodes implanted in the ear, even though treating a foot condition."

d.    That NSS service claims be specifically coded with CPT 64555 for peripheral nerve implantation or CPT 64553 for cranial nerve implantation and included detailed information about when the "-58 modifier" should be used with CPT 64555.

e.    That "for CPT 64555 and CPT 64553: There are differing opinions about 'implantation' in these definitions. The neurostimulator generator is not implantable; the electrodes are. Some people, including Medicare personnel I have discussed this with, consider the needle electrode arrays of the device to be percutaneously implanted when being placed directly into certain nerves in either the cranial or peripheral nerve bundles. The code definition says 'percutaneous implantation of neurostimulator electrodes', which is what I believe you are doing when placing the device. There are others that disagree and believe that there must be an incision made for the procedure to be 'implantation'. The guidance addresses devices that are 'implants' but not electrodes that can be implanted without an incision. Your office will have to decide which they agree with. If you do not believe the electrodes are implanted, use CPT 64999 – Unlisted procedure; nervous system."

f.    That "[o]ne of the services that I offer is a review of provider documentation to determine if it is clearly supporting the procedures being performed and the coding the provider is choosing to use. I am providing some sample codes below. However, you must code per your documentation and coding training."

g.    That the NSS could be billed in pre-operative, intra-operation, and post-operative circumstances.

h.    That "[t]here are a wide range of provider types using neurostimulators," but she never mentioned acupuncture as one of those qualifying providers.

i.    That 64555 was emphatically the appropriate code as "there are less acceptable diagnoses for use with the 64553, cranial nerve, procedure than the 64555, peripheral nerve, procedure. Historically, there have been more diagnosis mismatch denied/pending claims when using the 64553 procedure. Again, code to the highest level of specificity and per your documentation but be aware of this issue."

j.    And specifically advised the Rao Practice Entities to conceal the name of the device if doing pre-certified claims, stating: "I do recommend pre-certifying and using the coding description language. By this I mean referring to 'neurostimulator' rather than the trade name of the device. The device is just a type of neurostimulator and while the payer may ask for

21

> more information, which should be provided when requested, starting with asking to get pre-authorization under a trade name may automatically bring extra questions because they haven't heard of the device or may cause them to reference policies that do not apply to how the device is actually being used."

*See* <u>Exhibit 4</u> (emphasis added).

58.     So, from the start, the promise of extraordinary reimbursement was the foundation of Acclivity's (on behalf of and as directed by IHS) pitch to the Rao Practice Entities. Yet nowhere in the materials provided to the Rao Practice Entities by Acclivity and/or Long is it disclosed that the NSS was in fact cleared by the FDA as an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture. This, too, was in line with IHS's specific orders and directions to avoid the word acupuncture. And the coding and billing advice that Long provided to the Rao Practice Entities was identical in form and substance to that utilized by all IHS Sales Agents and Coding Agents as part of the NSS Coding Scheme.

59.     After experiencing some difficulties and receiving several inquiries from payers regarding his use and billing of the NSS, the Rao Practice Entities contacted Miller in July 2016 and requested a call to discuss various coding-related issues. By that time, Long was no longer working with Acclivity or IHS. So, Miller brought in two other Coding Agents to further perpetrate the NSS Coding Scheme. First, Miller sent an email to Dr. Rao and Goldbach on July 14, 2016 purporting to quote a letter from a "former AMA advisor as the [] use of CPT code for NSS" which stated:

**AMA Advisor Review:**

**"A thorough review of the coding literature and the LCDs generated by many Medicare carriers show that the CPT code 64555 appears to be the most accurate when applying use of the NSS system.** The neuro-stimulator technique that is used with these patients is clearly delineated from acupuncture and other neuro-stimulator treatments. The neuro-stimulator is programmed to provide a stimulation comprised of 0-10 HZ , impulse interval 1000 ms, monophasic impulse width 1 ms, ims/bipolar., changing polarity ( to avoid polarizing effects) , with an

maximum amplitude of 3.2 V.

**Procedure**: Mapping is done of patient's unique trigeminal, Greater Occipital, Lesser Occipital, cranial and peripheral nerve anatomy with subsequent placement of neuro-stimulator generator and percutaneous electrode array implantation at verified nerve sites.

Medicare LCDs, Noridian in particular relate that "Peripheral Nerve Stimulation may be covered for relief of chronic intractable pain for patients with conditions known to be responsive to this form of therapy." "Severe neuropathic pain is typically well suited for successful responses to PNS."

Such LCDs relate the treatment of occipital, trigeminal, peripheral, intercostal and ilio-inguinal nerves as well as lower back and trunk syndromes.

<u>64555 Percutaneous implantation of neurostimulator electrode array; peripheral nerve</u>- is the descriptor both in CPT and that recognized by Medicare and most private payers today.

I would opine that this is the most appropriate CPT code for such service."

Former advisor to AMA CPT editorial panel

*See* <u>Exhibit 6</u> (emphasis in original). Miller copied Kimberly Coleman on that email.

60.     On July 19, 2016, Kimberly Coleman, Miller, Dr. Rao, and Goldbach spoke by telephone. During that call, Coleman summarized her findings with respect to coding for the NSS when utilized in an ASC setting. These "findings" were, of course, identical to those: (i) communicated to Dr. Rao and/or Goldbach by Miller, Long, and the "AMA Advisor" whose letter Miller claims to have provided an excerpt of to Dr. Rao; (ii) communicated to the Bhambhani Practice Entities by IHCS and/or Acclivity; (iii) utilized by IHS during its prior promotion of the P-STIM prior to the development of the NSS; and (iv) those coding protocols found in the various template treatment notes, letters of medical necessity, and other materials provided to medical providers solicited by IHS Sales Agents, including IHCS, Acclivity, and others.

9571266.1 34295/144221  7/14/22

61.     On August 5, 2016, in a follow-up email, Coleman summarized her findings in an email to Dr. Rao and Goldbach:

a.      "Billing 64555 for Highmark, commercials. Recommended for office use as they paid for the LCode. I provide local policies. Aetna, Cigna, UHC HealthAmerica and UPMC will pay for the NSS with prior authorization. Note; For these insurance companies it is diagnosis based. ONLY USE 64553 is used for Migraine and Chronic Headache. 64555 for all pain neck and below. Again this is also diagnosis driven."

b.      "CPT guidelines state that use the most specific code available. **As long as documentation can prove 100% medical necessity**, it is justified."

c.      "NSS is a percutaneous implantation neurostimulator electrode array that are applied and leads are placed for specific nerves. You are providing the same type of services when you do a SCS Trial."

d.      "Unless a it [sic] specifies in a particular LCD not to use the 64555 or 64553 and L8600 you use these codes."

*See* Exhibit 5 (emphasis in original).

62.     In all, between September 2015 and October 2016, the Rao Practice Entities purchased 90 NSSs, to the tune of $45,194.00, all paid to Acclivity, who served as distributor and an agent-in-fact on behalf of IHS. *See* Exhibit 18.

63.     On or about March 15, 2017, however, the Rao Practice Entities reporting of the code sequences explicitly recommended by IHS and its agents as part of the NSS Coding Scheme prompted SafeGuard Services ("SGS"), the northeastern Unified Program Integrity Contract ("UPIC") administrator, responsible for evaluating claims payment data for areas of risk for inappropriate program payment, potential fraud, waste, and abuse, of the Medicare program in the northeastern area of the United States, including Maryland, initiated prepayment audits of both the Rao Practice Entities based on their reporting of "suspicious" procedure coding.

64.     Then, on May 22, 2017, the Rao Practice Entities reporting of the code sequences explicitly recommended by IHS and its agents prompted SGS to also initiate a post-payment audit

of both the Rao Practice Entities based on the same coding concerns.

65.     On September 29, 2017, the Rao Practice Entities received a series of refund demands from SGS on behalf of the Medicare program, with the total SGS refund demand exceeding $400,000.00.

66.     On October 19, 2017, the Rao Practice Entities received a series of additional refund demands from Novitas on behalf of the Medicare program, with the total Novitas refund demands exceeding $350,000.00.

67.     Together, the total amount of all refund demands received by the Rao Practice Entities on behalf of the Medicare program exceeded $750,000.00. While those refunds were appealed and remain pending before the Office of Administrative Law, a substantial portion of the disputed refund amount has already been offset from other claims payable to the Rao Practice Entities, and the Rao Practice Entities have already spent tens of thousands of dollars in legal fees and other related expenses relative to defending the Medicare audits—all on account of the deliberate misrepresentations by IHS and its agents vis a via the NSS Coding Scheme.

## RICO ALLEGATIONS

### A.     The NSS Enterprise

68.     Plaintiffs hereby replead and incorporate by reference each allegation set forth above, and further states as follows:

69.     Defendants and the individuals named herein are "persons" within the meaning of 18 U.S.C. § 1961(3).

70.     Based upon Plaintiffs' current knowledge, the following persons constitute a union or group of individuals associated in fact that Plaintiffs hereinafter refer to as the "NSS Enterprise."

    a.     IHS;

    b.     IHCS;

c.      Robin Campbell;

d.      Troy Guinn;

e.      Acclivity;

f.      Kuhlman;

g.      Dragon Slayer;

h.      Long;

i.      Coleman;

j.      Kimberly Coleman;

k.      Carrico;

l.      Smith;

m.      Brannon;

n.      Miller;

o.      Tomahawk Medical;

p.      Dixon Medical Distributors;

q.      Yet-to-be identified Sales Agents of IHS; and

r.      Yet-to-be-identified Coding Agents of IHS.

71.     The common purpose of the NSS Enterprise was to sell the NSS to medical providers. IHS profited from the sale of each NSS its Sales Agents sold. IHS Sales Agents profited from a spread between the wholesale price it paid to IHS for each NSS and the retail price it ultimately charged medical providers for each device whether as part of Full Service or Direct Purchase programs. The Consulting Agents were paid a flat fee per "account" to put their name and credentials behind the NSS Coding Scheme.

72.     The relationships by and among the members of the NSS Enterprise were well-defined:

a.      IHS is the owner and licensor of the NSS.

26

b.      IHS sought and received clearance from the FDA to market the NSS as an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture based on its representation that the NSS was substantially equivalent to the P-STIM.

c.      IHS developed the NSS Coding Scheme, fashioned from billing and coding protocols it previously deployed in marketing the P-STIM.

d.      IHS compiled information and documents on the clinical attributes of the device, proper indications for deploying the device, and purporting to support the NSS Coding Scheme (the "NSS Sales Materials").

e.      IHS provided the NSS Sales Materials to its Sales Agents, including the precise documents provided to the Plaintiffs as alleged herein, and controlled all messaging associated with marketing and selling the devices including, most notably, that no mention was to be made that the NSS was in fact FDA-cleared as an electroacupuncture device only.

f.      IHCS, Acclivity, Tomahawk Medical, Dixon Medical Distributors, and other yet-to-be identified Sales Agents of IHS were "exclusive" distributorships engaged by IHS to market and sell the NSS in defined geographic areas using the NSS Sales Materials or modified versions thereof.

g.      Campbell, Guinn, Smith, and Brannon were officers and/or executives with IHCS, tasked with marketing and selling the NSS in defined geographic areas using the NSS Sales Materials or modified versions thereof.

h.      Kuhlman and Miller were officers and/or executives with Acclivity, tasked with marketing and selling the NSS in defined geographic areas using the NSS Sales Materials or modified versions thereof.

i.      Concurrent to his association with Acclivity, Kuhlman also served as a National Director for IHS.

j.      Dragon Slayer, Coleman, and as yet-to-be identified Coding Agents, were retained and paid directly by IHS to support its Sales Agents by lending their name and the credentials of their owners, Long and Kimberly Coleman, respectively, to the coding sequences and protocols comprising the NSS Coding Scheme.

k.      IHS worked with the Coding Agents to develop "templates" to provide purchasing medical providers with boiler-plate chart notes, letters of medical necessity, and other forms (the "NSS Coding Forms") purportedly intended to support the use of the NSS and coding and billing consistent with the NSS Coding Scheme.

l.      IHS developed the NSS Coding Forms provided to purchasing medical

27

providers, as evidenced by the Sales Agents and Coding Agents all utilizing identical (not similar, identical) language and formatting with respect to the NSS Coding Forms they distributed to accounts.

m.  Acclivity and other Sales Agents processed orders made by accounts, took payments from ordering medical providers, and then remitted payment to IHS who in turn would fulfill each order.

73.     The NSS Enterprise maintained its existence from at least October 2014 (when the NSS first received FDA-clearance, *see* Exhibit 1) through October 2016 (the date of the Rao Practice Entities' last purchase of an NSS from IHS through Acclivity, *see* Exhibit 18), and upon information and belief for years beyond October 2016 as the NSS Enterprise continues to market the NSS to this day. In all, the NSS Enterprise either continues to maintain its existence or at the very least maintained its existence long enough to permit these associates to pursue the NSS Enterprise's purpose.

74.     While Defendants participate in, are members, and part of the NSS Enterprise, they also have an existence separate and distinct from this association-in-fact enterprise. With respect to IHS, it is distinct from the NSS Enterprise because, as noted above, each member of the NSS Enterprise performed different roles within the enterprise and, as noted below, the separate legal incorporation of the Sales Agents and the Coding Agents was used to facilitate the NSS Enterprise's pattern of racketeering activity. Specifically, the Sales Agents and Coding Agents and their relationships with IHS were intended to insulate IHS from the NSS Coding Scheme.

75.     The NSS Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce. Specifically, the purpose of the NSS Enterprise was to induce medical device sales from a licensor in Indiana, using Sales Agents around the country, including Ohio, Maryland, and Kentucky, assisted by Coding Agents around the country including Indiana and Ohio, to medical providers with offices around the country, including in Maryland, Virginia, and Pennsylvania.

9571266.1  34295/144221  7/14/22

**B.      The Pattern of Racketeering Activity**

76.      Plaintiffs hereby replead and incorporate by reference each allegation set forth above, and further states as follows:

77.      18 U.S.C. §1961(1) provides that a "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have and continue to engage in conduct violating these laws to effectuate their illegal scheme.

78.      For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations, or promises, the Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to those transactions and communications set forth in Exhibit 10 as to the Bhambhani Practice Entities, received by the Bhambhani Practice Entities in Abingdon, MD, as summarized by the chart annexed hereto as Exhibit 19; and Exhibit 18 as to the Rao Practice Entities, received by the Rao Practice Entities in Mount Airy, MD, from IHS and/or Acclivity via the Postal Service or commercial interstate carriers by at least 9 separate shipments.

79.      For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations, or promises, the Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire and through other interstate electronic media, matter and things including but are not limited to those transactions and communications set forth in Exhibit 10 and Exhibit 18 and the chart annexed

hereto as Exhibit 20.

80.     Other matter and things sent through or received from the Postal Service, commercial carrier, or interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate the fraudulent scheme.

81.     Defendants' misrepresentations, acts of concealment, and failures to disclose were made for the purpose of deceiving Plaintiffs and obtaining their property for the Defendants' gain.

82.     Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material.

83.     As a result, Defendants obtained money and property belonging to Plaintiffs, and Plaintiffs were injured in their business or property by Defendants' overt acts of mail and wire fraud.

84.     Defendants engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, that is, indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years. In fact, the Defendants have committed numerous acts of racketeering activity. Each act of racketeering activity was related; had a similar purpose; involved the same or similar participants and method of commission; had similar results; and impacted similar victims, including Plaintiffs.

85.     The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of future repetition and continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## CLAIMS FOR RELIEF

## COUNT ONE
## CIVIL VIOLATION OF RICO – 18 U.S.C. § 1962(c)
### (Against all Defendants)

86.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

87.    This claim for relief arises under 18 U.S.C. § 1962(c).

88.    Each Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

89.    Each Defendant and associate of the NSS Enterprise is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 18 U.S.C. 1962(c).

90.    Through agreements between the Defendants and joint management activity between the associates of the NSS Enterprise, the Defendants formed an association-in-fact, referred to herein as the NSS Enterprise, which constitutes an "enterprise" engaged in illegal activities affecting interstate commerce pursuant to 18 U.S.C. §§ 1961(4) and 1962(c).

91.    The purpose of the NSS Enterprise was to enhance Defendants' profits by misrepresenting, concealing, and defrauding Plaintiffs and the Proposed Class. At all relevant times, Defendants were associated with the NSS Enterprise through their joint ownership, employment, and/or business relationship with the NSS Enterprise, and its fraudulent and misrepresentative statements about the NSS and reimbursement for the NSS and services rendered. The Defendants were also associated with the NSS Enterprise through their participation in its management and operation by directing is affairs and assisting the fraudulent billing scheme. The Defendants participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of unlawful activity under 18 U.S.C §§ 1961(1)(b), 1961(5), and 1962(c), as follows:

31

a.  Multiple acts of mail fraud, in violation of 18 U.S.C. § 1341, detailed herein;

b.  Multiple acts of wire fraud, in violation of 18 U.S.C. § 1943, detailed herein; and

c.  Multiple instances of interstate transport of money converted or fraudulent obtained, in violation of 18 U.S.C. § 2314, detailed herein.

92.  Each Plaintiff suffered injury to his or her property, within the meaning of 18 U.S.C. § 1964(c), by reason of the violation of 18 U.S.C. § 1962(c). Plaintiffs were injured by reason of Defendants' RICO violations, described herein. The injuries of the Plaintiffs were proximately caused by Defendants' violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

## COUNT TWO
## CONSPIRACY TO COMMIT
## CIVIL VIOLATION OF RICO – 18 U.S.C. § 1962(d)
### (Against all Defendants)

93.  Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages, costs, and attorneys' fees from Defendants and other appropriate relief.

94.  Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

95.  This claim for relief arises under 18 U.S.C. § 1962(d).

96.  Each Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(d).

97.  Each Defendant and associate of the NSS Enterprise is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 18 U.S.C. 1962(d).

98.     Defendants conspired to conduct or participate, directly or indirectly, in the conduct of the affairs of the NSS Enterprise, through a pattern of racketeering activity. The conspiracy to violate § 1962(c) constitutes a violation of § 1962(d).

99.     In furtherance of the conspiracy to violate § 1962(c), Defendants agreed to commit numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the RICO Class Period, and they continue to commit such predicate acts, in furtherance of the recoupment scheme, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343.

100.    As a direct and proximate result of the conspiracy to violate § 1962(c), Plaintiffs and the Proposed Class members have each been injured in their business and property within the meaning of 18 U.S.C. § 1964(c), and are entitled to recover treble damages together with the costs of this lawsuit, expenses, and reasonable attorneys' fees.

**COUNT THREE**
**FRAUDULENT MISREPRESENTATION**
**(Against all Defendants)**

101.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

102.    Defendants made material misrepresentations to Plaintiffs by means of oral representations, labeling, advertisements, promotions/or marketing, that the NSS could be billed to third party payors and health insurers with a particular resulting reimbursement, as alleged more fully herein above. Although the Defendants may have included disclaimers or caveats with their misrepresentations, those disclaimers or caveats were ambiguous and, in the context of the balance of the communications by the Defendants, misleading. Moreover, the Defendants conduct was inconsistent with the disclaimers and caveats, rendering the latter ineffective. The general

33

disclaimers made by the Defendants were contradicted by their specific representations that the billing advice they gave in connection with their marketing was correct.

103.    Defendants' representations were untrue, or at the least, made with reckless disregard for its truth.

104.    Defendants made the representations herein alleged with the intention of inducing Plaintiffs to purchase NSSs from Defendants.

105.    At the time Defendants made the representations herein alleged, Defendants knew that the representations were false.

106.    Plaintiffs justifiably relied upon Defendants' fraudulent and intentional misrepresentations and, in reliance on those representations, were induced to purchase NSSs from Defendants.

107.    As a direct and proximate result of Defendants' intentional misrepresentations, Plaintiffs were harmed in an amount to be determined at trial.

**COUNT FOUR**
**INTENTIONAL MISREPRESENTATION BY CONCEALMENT**
**OR NON-DISCLOSURE**
**(Against all Defendants)**

108.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

109.    Defendants failed to disclose material facts regarding the reimbursement, billing and collections rules and characteristics in connection with the NSSs purchased by Plaintiffs, and the exposure the Plaintiffs would have to Medicare and third-party payors if they followed Defendants' billing advice.

110.    Defendants had to a duty to disclose, failed to disclose, and purposefully failed to disclose accurate facts about the billing and collections rules and characteristics about the NSS.

34

111.     Specifically, the Defendants intended to deceive the Plaintiffs of the fact that the NSS did not have the attribute of being billable and reimbursable in the way asserted by the Defendants, and knew that the Plaintiffs would have not purchased the NSS or NSS services, or paid a lower price for the NSS or NSS services had Plaintiffs knew of the undisclosed material facts.

112.     This failure to disclose induced the Plaintiffs to act.

113.     As a direct and proximate result of Defendants' concealment of material facts, Plaintiffs were damaged in a way to be determined at trial.

## COUNT FIVE
## CIVIL CONSPIRACY
### (Against all Defendants)

114.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

115.     All Defendants consist of two or more persons.

116.     All Defendants did agree or had an understanding to effectuate the intentional misrepresentations, concealment of material facts, and/or the conduct alleged in the foregoing paragraphs.

117.     The agreement(s) by all Defendants was designed to pursue an unlawful purpose.

118.     As a direct and proximate result of Defendants' agreement(s) to pursue an unlawful purpose, Plaintiffs suffered and continue to suffer special damages.

9571266.1  34295/144221  7/14/22

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand relief in their favor and against the Defendants as follows:

1.      That judgment be entered against Defendants and in favor of Plaintiffs on the Causes of Action in this Complaint, for actual, compensatory, and punitive damages, in an amount to be determined at trial;

2.      That, pursuant to RICO, the Plaintiffs be awarded an amount three times the amount of any and all damages suffered as a result of the illegal acts set forth herein, as well as any and all other amounts or damages allowed to be recovered under RICO;

3.      That the Court award the Plaintiffs attorneys' fees and litigation costs against Defendants;

4.      That judgment be entered imposing pre-judgment interest on damages, attorneys' fees, and litigation costs against Defendants; and

5.      That the Court award against Defendants and for Plaintiffs all other and further relief, both at law and in equity, to which they may show themselves justly entitled.

9571266.1  34295/144221  7/14/22

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial on all issues so triable.

Dated: July 14, 2022

Respectfully submitted,

*/s/ Robert A. Gaumont*

John W. Leardi (*pro hac vice* pending)
Paul D. Werner (*pro hac vice* pending)
Nicole P. Allocca (*pro hac vice* pending)
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
(609) 799-5150

Robert A. Gaumont (Bar No. 26302)
GORDON FEINBLATT LLC
233 E. Redwood Street
Baltimore, MD  21202
(410) 576-4007

*Attorneys for Plaintiffs Ritu Bhambhani, LLC, Box Hill Surgery Center, LLC,
Pain and Spine Specialists of Maryland, LLC, and SimCare ASC LLC*

37